**Lindsey Barlen ROGERS and Clara Rogers Howell,**
**Plaintiffs-Appellants/Cross-Appellees,**

v.

**UNITED STATES of America, et al.,**
**Defendants-Appellees/Cross-Appellants.**

**Nos. 81–4503, 81–4527.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 17, 1982.

Decided Jan. 28, 1983.

---

Peter J. Sferrazza, Reno, Nev., for Rogers and Howell.

Wendy B. Jacobs, Dept. of Justice, Washington, D.C., for the U.S.

Before BROWNING, PREGERSON, and POOLE, Circuit Judges.

PREGERSON, Circuit Judge:

Appellants Rogers and Howell, members of the Yerington Paiute Tribe, filed applications with the Department of the Interior (Interior) to receive their share of funds appropriated by Congress to satisfy awards to the Northern Paiute Nation.[1] After their applications were denied by Interior on grounds of late filing, Rogers and Howell brought an action for damages and non-monetary relief.

Appellants contend that Interior's action constitutes a breach of trust duties compensable under the Tucker Act, 28 U.S.C. § 1346(a)(2), in conjunction with the Distribution of Judgment Funds Act (DJFA), 25 U.S.C. §§ 1401–1407.[2] Their

---

1. Although there is no politically organized group known as "the Northern Paiute Nation," the appellation was used by the Indian Claims Commission in making its awards. The Northern Paiute, sometimes called Paviotso, are a people comprising linguistically and culturally related bands or tribes found throughout most of western Nevada and adjacent areas. Letter from the Secretary of the Interior to the Speaker of the House, covering the Northern Paiute distribution plan (July 13, 1974).

2. The Tucker Act grants jurisdiction to hear claims for damages against the United States where there exists an independent, substantive right enforceable against the United States for money damages. *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). This is true whether jurisdiction is premised on 28 U.S.C. § 1491, as in *Testan,* or on 28 U.S.C. § 1346(a)(2), as in the instant case. *Moose v. United States,* 674 F.2d 1277, 1280 n. 4 (9th Cir.1982). If under the DJFA Indian judgment funds are deemed held in trust, a substantive right exists, and sovereign immunity is waived with respect to damage claims predicated on a breach of trust duties. 674 F.2d at 1282.

request for non-monetary relief is predicated on an allegation of inadequate notice by Interior to those entitled to share in the appropriated funds. They seek review of Interior's action under a provision of the Administrative Procedures Act (APA), 5 U.S.C. § 706(2)(D), which authorizes reviewing courts to set aside agency actions found to be "without observance of procedure required by law." Jurisdiction of the APA remedial claim is conferred by 28 U.S.C. § 1331. *See Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977) (jurisdiction of APA actions under section 1331 subject only to preclusion-of-review statutes).

· The Government argues in reply to appellants' claims for damages that the DJFA created no trust. The district court agreed and dismissed the claims. The court found, however, that the Secretary of the Interior had failed to comply with a provision of the DJFA requiring promulgation of regulations governing adequacy of notice to persons entitled to funds under Indian judgments. Accordingly, the court held that appellants' applications could not be rejected solely on grounds of lateness.

Appellants appeal the dismissal of their claims for damages. The Government cross-appeals the district court's holding that the applications could not be rejected for late filing.

## FACTS

In 1961, the Indian Claims Commission awarded the Northern Paiute Nation compensation for lands taken by the United States in 1872. Later in 1961, Congress appropriated funds to satisfy the award. In 1965, the Commission awarded compensation for lands taken in 1853 and 1862. Congress appropriated funds to satisfy this award in 1967. In 1973, before any of the Northern Paiute funds had been distributed, Congress enacted the DJFA to establish general guidelines for the distribution of funds awarded by the Commission.

Interior's plan for distributing the Northern Paiute funds was submitted to Congress in July 1974.[3] The plan provided for per capita distribution of the funds. Proposed enrollment regulations, published in the Federal Register in January 1975, required that applications for enrollment be received within 180 days of the publication of final regulations. 40 Fed.Reg. 3309 (1975). On April 16, 1975, the final enrollment regulations were published. 40 Fed.Reg. 17,022 (1975). Interior's Bureau of Indian Affairs (BIA) publicized the regulations through releases distributed to news media and letters and posters sent to Indian groups and centers.

The enrollment regulations were effective upon publication, thus making the filing deadline October 13, 1975. Because October 13 was a federal holiday, Interior decided in 1978 that applications received by October 14, 1975, would be considered timely. Due to confusion in the BIA regarding the nature of the deadline, BIA staff told some Indians that timely applications had to be *postmarked* no later than October 14, 1975. To correct this error, Interior also decided in 1978 that applications signed and dated on or before October 14, 1975, and received by October 24, 1975, would be considered timely. Rogers' application was dated and postmarked October 10 and received on October 28. Howell's application was dated October 21 and received on October 28. Both applications were rejected as untimely. Rogers and Howell appealed to the BIA, claiming no knowledge of the deadline. After their appeals were denied, they commenced this action.

## ANALYSIS

### A. Failure of the Secretary to Promulgate Regulations

The district court set aside Interior's action because it was taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The court read section 1406(a) of the DJFA as requiring the pro-

---

**3.** The plan was not submitted within 180 days of October 19, 1973, as required by 25 U.S.C. § 1402(a). In 1980 Congress declared the plan effective as of October 10, 1974. Act of Feb. 21, 1980, Pub.L. No. 96–194, 94 Stat. 61.

mulgation of regulations governing adequate notice. The section provides:

> The Secretary shall promulgate rules and regulations to implement this chapter no later than the end of the one hundred and eighty-day period beginning on October 19, 1973. Among other things, such rules and regulations shall provide for adequate notice to all entities and persons who may receive funds under any Indian judgment of all relevant procedures pursuant to this chapter concerning any such judgment.

The Government first contends in its appeal that section 1406(a) is ambiguous, requiring either adequate procedures or rules prescribing the manner in which notice shall be given. In the face of such ambiguity, the Government concludes, the courts must defer to Interior's interpretation that adequate procedures satisfy the statute. *See New York State Department of Social Services v. Dublino,* 413 U.S. 405, 421, 93 S.Ct. 2507, 2516, 37 L.Ed.2d 688 (1973).

█ We reject the Government's premise that the statute is ambiguous. We consider both the language of the statute and its purpose. *See Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). Section 1406(a) expressly requires the promulgation of rules governing adequate notice in the case of *any* Indian judgment. The purpose of the Act was "to delegate much of the function of the Congress" to the Secretary. H.R.Rep. No. 377, 93d Cong., 1st Sess. 5 (1973), *reprinted in* 1973 U.S.Code Cong. & Ad.News 2311, 2313. Congress was willing to reduce its formerly active role to one of oversight on the condition that the Secretary be held to certain standards: "The bill establishes guidelines, procedures, and factors which the Secretary *must* take into consideration in preparing ... [a] plan [of distribution]." *Id.* (emphasis added). If we were to agree with the Government that Congress required only ad

hoc notice measures by the Secretary, the effort of Congress to establish guidelines for the preparation of future distribution plans would be severely undercut. *Cf. Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (due process right to be heard has little worth unless one is informed of the matter pending).

█ The Government next contends that the decision to set aside the BIA's rejection of appellants' applications was improper because the APA requires that "due account ... be taken of the rule of prejudicial error." 5 U.S.C. § 706(2)(F). The Government relies on a statement by the district court to the effect that notice had been adequate.[4] We do not so read the district court's orders. First, the court expressly found that Rogers and Howell did not receive notice. Second, the court declared that in the absence of a notice regulation promulgated by the Secretary of the Interior, adequacy of notice could not be determined. Under these circumstances, the rule of prejudicial error does not require that we sustain Interior's action. *See Buschmann v. Schweiker,* 676 F.2d 352, 358 (9th Cir.1982); *United States Steel Corp. v. United States Environmental Protection Agency,* 595 F.2d 207, 215 (5th Cir.1979).

Based on the above analysis, we affirm the district court's decision setting aside the rejections of appellants' applications. Ordinarily, this affirmance would end our inquiry. Here, however, the Government asserts that all appropriated funds have been allocated to persons whose applications were accepted by Interior. Should the district court determine that the appropriated funds have been exhausted,[5] it will need to consider the question of the Government's duties as trustee of funds appropriated for distribution under the DJFA.

---

4. The district court's statement that notice procedures were in fact adequate was made in the course of the court's preliminary discussion of adequacy of notice. The court immediately discounted the statement's validity and ordered that the issue be further briefed.

5. There are suggestions in the record that some distribution checks have not been and never will be cashed.

## B. Breach of Trust Duties

 On the basis of our holding in *Moose v. United States,* 674 F.2d 1277 (9th Cir. 1982), we must disagree with the district court's disposition of appellants' claims for damages. We recognized in *Moose* that for a century and a half, the Supreme Court has characterized the relation of the United States to the Indian nations as a unique trust obligation. *Id.* at 1281 n. 9. With this strong tradition in mind, we recognized that there is a presumption that absent explicit language to the contrary, all funds held by the United States for Indian tribes are held in trust. *Id.* at 1281. We also observed that section 7 of the DJFA, 25 U.S.C. § 1407,[6] indicates a congressional belief that all funds appropriated to satisfy Indian judgments are held in trust. *Id.* at 1282.

Identifying and notifying trust beneficiaries is a traditional trustee duty, *see* G. Bogert, *Trusts & Trustees* § 583, at 348 (2d ed. 1962), which DJFA requires Interior to perform effectively. Interior breached its duty as a trustee by failing to comply with section 1406(a). We express no opinion, however, regarding the appropriateness of an award of damages. Beneficiaries seeking damages for a breach of trust must not only show that a trust exists and has been breached but also that the breach caused the beneficiaries' injury. *Id.* § 871, p. 89. On remand, appellants have the burden of showing that Interior's failure to comply with the procedures required by section 1406(a) resulted in their failure to receive notice.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

---

**6.** 25 U.S.C. § 1407 provides:

None of the funds distributed per capita or held in trust under the provisions of this chapter shall be subject to Federal or State income taxes, and the per capita payments shall not be considered as income or resources when determining the extent of eligibility for assistance under the Social Security Act.